**Lillard BOND and Jack Harris, Appellants,**

**v.**

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

Feb. 17, 1967.
As Modified on Denial of Rehearing

. May 19, 1967.

B. M. Westberry, Marion, Joseph Grace, Paducah, for appellants.

Robert Matthews, Atty. Gen., Lacey T. Smith, Asst. Atty. Gen., Frankfort, for appellee.

HILL, Judge.

Appellants Lillard Bond and Jack Harris were jointly indicted with Frankie Jones and charged with the wilful murder of Thruston Belt. Appellants Bond and Harris were convicted and given penitentiary terms of ten years each. They appeal. Jones had not been tried when the briefs in this action were prepared.

Appellants argue that: (1) They were entitled to a "directed verdict of not guilty";

(2) evidence obtained by reason of an illegal search should not have been admitted; (3) the instructions were erroneous; (4) they were denied a speedy trial; (5) the trial court erred in overruling their motion for a bill of particulars. After reciting the facts, we shall discuss these questions in the order listed above.

On Sunday night, May 9, 1965, the home of Thruston Belt, located four miles west of Marion, Kentucky, was completely destroyed by fire. A badly burned torso was found in that part of the ashes over which the bedroom of the house formerly was located. Numerous bone fragments were found, part of which were recovered some distance from the torso; none were larger than a silver dollar. Thruston Belt was in the community late in the afternoon before the night of the fire. He has not been seen since. A watch and cigarette lighter were found near what a mortician said was the torso of a male human being and were identified by members of Belt's family as having been the property of Belt.

The deceased, Thruston Belt, and one Billy (William Grady) Hodge on Saturday and Sunday preceding the night of the fire worked on an automobile. Late Sunday afternoon, Hodge took deceased to the entrance of a gravel road leading up a steep incline, a distance of about one-half mile to the home of the deceased. Belt started walking the distance carrying his toolbox. Hodge (in the company of his wife and child) met an old model car shortly after pulling away, and they (the Hodges) observed the old car slow up preparatory to pulling into the driveway of deceased. The Hodges recognized one or two of the occupants of the old car.

The next evidence of deceased was provided by the star witness for the Commonwealth, Alfreda Jones, wife of appellants' codefendant Frankie Jones. But for her testimony, the Commonwealth would not have a scintilla of evidence against appellants.

According to convincing evidence, the home of appellant Lillard Bond was for some time before May 9, 1965, a place where people of both sexes gathered and drank, sang songs, played the guitar, and fought often.

Alfreda Jones and her husband Frankie Jones, from whom she is now separated, came to the home of appellant Lillard Bond two or three weeks before the date of the alleged crime and made arrangements with Bond to get their food and lodging in consideration of the promise of Frankie Jones to assist Bond in farming operations. At the time she gave her testimony, Alfreda Jones was living in Nashville, Tennessee. She testified that she, her husband Jones, and appellants were drinking and playing the guitar before and after dark on the fatal Sunday evening, when someone, whose identity she could not give, brought deceased to the Bond home. The frolic continued up into the evening until her husband Frankie Jones, Jack Harris, and deceased "left the house" and were gone a "good little while." Then appellant Bond left the house. She never saw deceased again, and no car came that evening to pick him up.

Alfreda Jones testified her husband had and customarily carried a yellow-handled straight razor previous to that evening, which she never saw again.

On the examining trial of appellants, Alfreda Jones did not identify Belt. But shortly before the trial in circuit court, she was shown a photograph of deceased, and she identified deceased as the person who was brought to the Bond home that night.

She also testified that later in the evening she, appellants, and Frankie Jones got into a car and drove through the town of Marion and up a gravel road that was so steep the car "throwed gravel and rocks." Another witness, who resided near the entrance of the gravel road leading to the home of deceased, was awakened during the night by the noise from a car climbing the steep

hill of the gravel road. He fixed the time at about 11:30 p. m.

The testimony of Alfreda Jones goes on to relate that the four of them drove to the top of the hill; that the three men got out, leaving her in the back seat where she "laid down"; that the three men went around and opened the trunk of the car and then went away from the car and were gone a "good little while" when they returned; that Frankie Jones "went around to the trunk and done something back there and he went back"; that they "seemed restless" during this period; and that after a short time, Frankie returned to the car and they drove back to the Bond home.

Three witnesses fixed the time the house was at the height of burning at 12:30 p. m.

As soon as the group returned to the Bond home, Alfreda went to bed. Not long thereafter, her husband came in, crossed his legs, leaned up against the wall for a time, and then "laid down" on the bed with his clothes on. The next morning she observed blood stains on the bedding and on the wall where, the night before, her husband had placed his hand against it.

A search of the Bond residence fourteen days later resulted in the possession by the sheriff of a number of articles of clothing and a "small metal toolbox containing an assortment of hand tools."

The toolbox and tools were positively identified by Billy Hodge as the identical ones used by deceased on the Sunday preceding the fire. A short piece of clothesline wire was identified as the one Hodge removed from the premises of his mother during the time he and deceased were working on the car. The evidence obtained by the search is questioned by appellants and will be discussed later.

Appellants deny practically every word of testimony given by Alfreda Jones.

■ We cannot agree with appellants' first contention that they were entitled to a directed verdict of not guilty. The web of circumstantial evidence points toward the guilt of appellants. Assuming the testimony of Alfreda Jones was true, and the jury obviously believed it, we find deceased at the home of Bond with the other parties; no motor vehicle was heard to take deceased away; appellants were in the party that drove through town and up a steep "gravel hill." What was the purpose of this trip in the middle of the night? Where was Belt during this trip? He was not on the seat of the car. Was he in the truck? If so, what shape was he in? The fire was seen giving out its brightest light one hour after the departure of the group from the "top of the hill." The skull bone fragments were found in a different part of the house than was the torso. Had Belt committed suicide or died a natural death, his head would not have been in one room and the remaining part of his body in another. The restless demeanor of the three men, the blood from Frankie Jones, the tools of deceased, and the vanishing of the razor are efficacious signs pointing to the guilt of Jones and these two appellants. They were charged with a conspiracy.

In Lester v. Commonwealth, 284 Ky. 352, 144 S.W.2d 808, 810, this court said:

"It is true that a conviction may be had upon circumstantial evidence and especially is this true as to charges of conspiracy where direct proof is seldom available but the circumstances relied on to establish a conviction must be so unequivocal and incriminating in their nature as to exclude every reasonable hypothesis of the innocence of the accused."

■ We turn now to the question raised by appellants that the toolbox and tools should not have been admitted for the reason that these items were not covered by the search warrant. The search warrant directed the sheriff to take "any clothing, bed clothing or *other articles containing blood or signs of blood.*" (Emphasis ours.) Some of the tools were instruments that could have easily produced death, such as a

14-inch pipe wrench. The search was made fourteen days after the alleged crime, and blood stains will become discolored during that length of time. Some of the tools had a rusty-red color. We think the sheriff was empowered under the search warrant to take possession of the toolbox and tools.

 Appellants next say the giving of a voluntary manslaughter instruction was error. Our attention is "invited" to Daggit v. Commonwealth, Ky., 237 S.W.2d 49. We have accepted the invitation and have examined Daggit and find that in Daggit the "confession of the homicide characterize(s) it as murder." This court said in Johnston v. Commonwealth, 170 Ky. 766, 186 S.W. 655, in the same posture as Daggit, supra, that, "Therefore, appellant is guilty of murder or nothing." In the present case, the evidence of the presence of blood on Frankie Jones is some evidence of a struggle. There is no evidence of any shooting. We do not consider the giving of a voluntary manslaughter instruction prejudicial. See Lee v. Commonwealth, Ky., 329 S.W.2d 57 (1959).

Appellants contend they were denied a "speedy" trial. The trial commenced March 22, 1966, ten months and thirteen days after the date of the alleged crime. An effort was made in November 1965 in Crittenden County to obtain a jury. Appellants report to us that a jury "was unable to be empanelled" at that time, necessitating a continuance until March 1966. Furthermore, there was no motion by appellants for a trial or to assign their cases earlier than the date fixed on the various occasions when they were continued. We find no merit in this contention.

Appellants' departing salvo is directed at the ruling of the trial court overruling their motion for a bill of particulars. To quote appellants' brief, "This motion was directed toward establishing with particularity how the deceased Belt was murdered and particularly who mudered (sic) him."

We have the suspicion the Commonwealth was more eager for this information than were appellants. This information was a request for evidence of the crime itself and was a matter of evidence. The jury's verdict indicated the information sought by motion for a bill of particulars was wholly within the knowledge of appellants.

The judgment is affirmed.

All concur.